UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| BRADLEY CHANCE CADENHEAD, | § | |
| TDCJ-CID NO. 02449471 | § | |
|     Petitioner | § | |
| v. | § | No.  4:25-cv-184 |
| | § | |
| ERIC GUERRERO, | § | |
| DIRECTOR TDCJ-CID | § | |
|     Respondent | § | |

**BRIEF IN SUPPORT OF PETITION FOR
WRIT OF HABEAS CORPUS (28 U.S.C. §2254)**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Petitioner Bradley Chance Cadenhead, by and through his undersigned counsel, and files this brief in support of his Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. §2254.

That an accused is guaranteed the right to effective assistance of counsel is axiomatic and the law of the land. Here, Petitioner was merely 16-years-old at the time of the alleged offense, and the gravamen of this petition pertains to how a forensic psychologist could have mitigated the offense conduct. Ultimately, the trial court sentenced Petitioner in a draconian manner: three stacked sentences of 20 years' confinement, followed by another 20-year sentence, and then 10 years'

probation immediately following Petitioner's eventual release from incarceration. SHCR 7-10.[1]

Because Petitioner's federal constitutional right to effective assistance of counsel was violated, he now asks this Court to grant relief. In support of his Petition for Writ of Habeas Corpus, Petitioner would show this Court the following:

PROCEDURAL BACKGROUND

On September 22, 2022, in cause number 22CRDC-00016 in the 266th Judicial District Court of Erath County, Texas, Petitioner was indicted for nine counts of possession with intent to promote visual material that depicted a child younger than 18 years of age engaging in sexual conduct (second-degree felony). SHCR 4-7.

On March 27, 2023, pursuant to the advice of Trial Counsel Lukas Lawrence (hereafter, "Trial Counsel"), Petitioner waived jury trial and pleaded guilty to all nine counts of the indictment without a plea agreement with the State. CR 69-74; 2 RR 6-8. Following a sentencing hearing on May 16, 2023, the trial court sentenced Petitioner to 20 years of confinement on each of the first eight counts and 10 years' probation on the ninth count. The sentences on the first three counts were stacked, and then the sentences were ordered to run concurrently on the fourth through eighth

---

[1] For purposes of this brief, the state habeas corpus record is abbreviated SHCR, the clerk's record from the direct appeal is abbreviated CR, and the reporter's record from the plea and sentencing proceedings is labeled RR, with the volume number preceding "RR" and the page number following the "RR" abbreviation.

counts, with those sentences to begin after Petitioner was released from confinement on the third count. The term of probation would begin after Petitioner is released from confinement on the fourth through eight counts. CR 104-06; SHCR 7-10.

On November 7, 2024, Petitioner filed an application for writ of habeas corpus in state court, alleging one ground of ineffective assistance of trial counsel. SHCR 28. The State filed its Answer/Reply on December 6, 2024, and then the trial court signed the State's proposed order recommending that relief be denied on December 9, 2024. SHCR 100, 136. Petitioner then filed a Motion to Reconsider Denial of Writ Application and Request for Entry of Order Designating Issues on December 10, 2024. SHCR 139. The trial court denied this motion on December 18, 2024. SHCR 149. Petitioner then filed objections to the trial court's findings of fact and recommendation on January 7, 2025. On February 5, 2025, the Texas Court of Criminal Appeals denied relief without written order.

<u>STATEMENT OF FACTS</u>

At the sentencing hearing, Jeanine Parmentier, a crime scene evidence technician for the Stephenville Police Department, testified that she processed a search warrant for electronic evidence on August 25, 2021, at Petitioner's residence. 3 RR 10. Parmentier collected two laptop computers, three cell phones, and a modem. 3 RR 10-11. She then mailed the items to DPS for analysis. 3 RR 13-14.

3

Kathleen Hickey testified that she is a computer investigations specialist for DPS' crime laboratory. 3 RR 15-16. During her forensic investigation of the items submitted to DPS, Hickey found videos, images, and files relating to possible child pornography. 3 RR 21. She then submitted a copy of the hard drive to the Stephenville Police Department. 3 RR 23.

Jeremy Lanier testified that he is a lieutenant for Stephenville Police Department, and he investigates electronic crimes. 3 RR 25. Lanier testified that in June 2021, his office received multiple cyber-tips that indicated child pornography was being disseminated from an IP address registered to Petitioner's mother. 3 RR 26-27. The cyber-tip also indicated that the suspect's first name was "Brad," and the manager of the apartment complex where Petitioner's mother lived stated that a young man named "Bradley" lived at the apartment with her. 3 RR 27. Lanier testified that he contacted Petitioner's mother during the execution of the search warrant, and she indicated that the laptop computer and cell phone belonged to Petitioner. 3 RR 27-28.

Regarding the content of the materials, Lanier testified that in addition to child pornography, there were a significant number of additional images depicting children being harmed, deceased children, bodies manipulated with significant wounds, and images of a human body with the username of Petitioner's internet group carved into their chest. 3 RR 29. In addition to detailing the grotesque nature

4

of the images, Lanier testified that Petitioner was found to have "cyberbullied" members of his group to manipulate them into providing pornographic files and commit self-harm. 3 RR 38-39.

On cross-examination, Lanier testified that Petitioner was only 15-years-old when these incidents occurred, and he was 17-years-old at the time of the sentencing hearing. 3 RR 40. Lanier testified that Petitioner had not committed any further cyber-related offenses since his arrest and transfer to adult court. 3 RR 41.

Bobby Stidham, the director of the community supervision and corrections department, testified that he conducted a presentence investigation in this case. 3 RR 42. Based on his discussions with Petitioner, Stidham testified that Petitioner obtained the child pornography because it interested a group of individuals on Petitioner's internet server, and Petitioner described himself as the leader of that group. 3 RR 44. On cross-examination, Stidham testified that Petitioner did not violate any of the conditions of his bond, including a condition that prohibited him from accessing the internet. Further, Stidham testified that Petitioner was in treatment for his mental-health issues. 3 RR 47-49.

Sarah Trevino testified that she is a behavior health therapist at Excel Health, and she was only licensed as an LPCA (licensed professional counselor associate) at the time of the hearing. 3 RR 50. Trevino testified that an LPCA means that she works under the supervision of another individual, and she had held this license for

22 months at the time of the hearing. 3 RR 50-51. According to Trevino, she began seeing Petitioner in a therapeutic capacity on March 8, 2022. 3 RR 50-51. Trevino testified that Petitioner suffers from behavioral dysregulation and bipolar disorder. 3 RR 52. Trevino further testified that Petitioner has received cognitive behavioral therapy, along with some dialectical behavioral therapy, and some progress was being made. 3 RR 52-53. Moreover, Trevino testified that Petitioner's ability to function in society has improved over the last year, and he is not an imminent risk to others or himself. 3 RR 53. Regarding Petitioner's brain development, Trevino testified that a human brain is still developing from 15 to 17 years old, as both self-awareness and decision-making processes improve with age. 3 RR 55. In fact, the brain continues to mature until age 25. 3 RR 55.

On cross-examination, Trevino testified that Petitioner does not have difficulty controlling his impulses, but they are a constant battle within his mind. 3 RR 56. Trevino also admitted that she was not aware of the extent of the depravity of the pornographic images in this case. 3 RR 58. However, she adhered to her testimony that Petitioner is not an imminent risk to himself or others. 3 RR 60.

STANDARD OF REVIEW

Under 28 U.S.C. §2254(d), a federal court may not grant habeas relief unless the state court adjudication (1) was contrary to federal law then clearly established in the holdings of the Supreme Court; (2) involved an unreasonable application of

clearly-established Supreme Court precedent; or (3) was based on an unreasonable determination of the facts in light of the record before the state court. *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011). Review of a state court's decision "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398–99 (2011).

Under 28 U.S.C. §2254(d)(1), a state court's decision is "contrary to ... clearly established Federal law," as determined by the U.S. Supreme Court, "if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts." *Bell v. Cone,* 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). A state court's decision involves an unreasonable application of clearly established federal law as determined by the U.S. Supreme Court, within the meaning of §2254(d)(1), "if the state court identifies the correct governing legal rule ... but unreasonably applies it to the facts" or "if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor,* 529 U.S. 362, 407 (2000). In determining whether a state court made an unreasonable application, a federal court asks whether it is possible that fair-minded jurists could disagree about the correctness of the state court's decision. *Richter*, 131 S.Ct. at 786.

28 U.S.C. §2254(d)(2) commands deference to the state habeas court's factual determinations by precluding relief on any claim that was adjudicated on the merits unless the state-court decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court." Such determinations are presumed to be correct, although a petitioner can rebut this presumption with clear and convincing evidence. 28 U.S.C. §2254(e)(1).

RELEVANT LAW REGARDING INEFFECTIVE ASSISTANCE OF COUNSEL

The United States Supreme Court has articulated a two-pronged test for assessing whether a defendant's counsel rendered ineffective assistance. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). First, a reviewing court assesses whether counsel's performance was "deficient." *Strickland*, 466 U.S. at 687. To establish that counsel was deficient, the defendant must allege specific instances where his counsel failed to meet a reasonable professional standard of competency. *Id.* A defendant must show by a preponderance of the evidence that counsel was deficient. *Id.*

The second prong requires a showing that counsel's deficiency actually prejudiced the defendant. *Id.* Prejudice results when "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* The Supreme Court further held: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, at 694.

While a defendant does not have to show that his counsel's deficiency "more likely than not" affected the outcome, he must demonstrate from concrete facts in the record that his counsel's deficiency had more than "some conceivable effect on the outcome of the proceeding." *Id.*, at 693.

The test for determining the validity of a guilty plea is "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). Where, as here, a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice "was within the range of competence demanded of attorneys in criminal cases." *McMann v. Richardson*, 397 U.S. 759, 771 (1970).

When the challenge to the guilty plea is based on ineffective assistance of counsel, courts apply the two-pronged *Strickland* test. *See Hill v. Lockhart*, 474 U.S. 52, 58 (1985); *Strickland v. Washington*, 466 U.S. 668, 687-94 (1984). A defendant must show: (1) that counsel's performance was deficient, and (2) "that there is a 'reasonable probability' — one sufficient to undermine confidence in the result — that the outcome would have been different but for his counsel's deficient

9

performance." *Strickland*, 466 U.S. at 694. The defendant has the burden to prove ineffective assistance of counsel by a preponderance of the evidence. *Id.*, at 687.

In the context of guilty pleas, the first half of the *Strickland* test is applied in the same manner as in other contexts. *See Hill*, 474 U.S. at 58. In other words, the defendant must show that counsel's advice "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. The "prejudice" requirement, on the other hand, is applied somewhat differently. The focus of the prejudice inquiry is "on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill*, 474 U.S. at 59. In other words, in order to satisfy the "prejudice" requirement, a defendant must show that there is a reasonable probability that, but for counsel's errors, they would not have pleaded guilty and would have insisted on going to trial. *Id.* "[B]ecause a guilty plea is an admission of all the elements of a formal criminal charge, it cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts." *McCarthy v. United States*, 394 U.S. 459, 466 (1969). The constitutional validity of a guilty plea made upon the advice of counsel depends on whether counsel's advice "was within the range of competence demanded of attorneys in criminal cases." *Richardson,* 397 U.S. at 771. Thus, a defendant's election to plead guilty or *nolo contendere* when based upon erroneous advice of counsel is not done voluntarily and knowingly.

## GROUND FOR HABEAS CORPUS RELIEF

**Petitioner's trial counsel rendered ineffective assistance when he advised Petitioner to plead guilty to nine counts of possession with intent to promote child pornography and then conducted a sentencing hearing without investigating expert assistance in forensic psychology to evaluate Petitioner and offer an expert opinion to the trial court regarding his prospects for rehabilitation and recidivism.**

*Argument and Authorities*

A.    Trial Counsel rendered ineffective assistance.

*1. Deficient Performance*

Petitioner was entitled to an advocate who would investigate the law and facts relating to his case. *Bouchillon v. Collins*, 907 F. 2d 589, 597 (5th Cir. 1990). Counsel has an "absolute duty" to perform a thorough investigation. *Brown v. Sternes*, 304 F.3d 677, 693-698 (7th Cir. 2002). This requirement includes an obligation to seek out expert assistance where there is a crucial issue in a case that necessitates such assistance. *See Richey v Bradshaw*, 498 F.3d 344, 353 (6th Cir. 2007).

There is no strategic decision with respect to defense counsel's sentencing strategy where counsel chooses to abandon their investigation at an unreasonable juncture. *See Wiggins v. Smith*, 539 U.S. 510, 527-28 (2003). "In investigating potential mitigating evidence, counsel must either (1) undertake a reasonable investigation or (2) make an informed strategic decision that investigation is

11

unnecessary." *Charles v. Stephens*, 736 F.3d 380, 389 (5th Cir. 2013) (per curiam). "[U]nder a *Strickland* analysis, trial counsel must not ignore pertinent avenues of investigation, or even a single, particularly promising investigation lead." *Id.* at 390 (internal quotation marks and citations omitted).

Here, if Trial Counsel had retained an expert in forensic psychology, he would have discovered the root causes of Petitioner's mental-health issues, which led to the conduct that the trial found to so abhorrent at sentencing. Moreover, a forensic psychologist would have been able to opine about Petitioner's chances of rehabilitation in a manner that a relatively inexperienced counselor like Sarah Trevino was unable to do. For example, Ms. Trevino was only a licensed professional counselor associate (LPCA), which means she worked under the supervision of another individual, and she had only held that entry-level license for 22 months. 3 RR 50-51.

According to Petitioner's sworn statement, Trial Counsel failed to discuss the possibility of hiring a forensic psychologist to evaluate him and offer expert testimony at the sentencing hearing. *See* SHCR 72. Rather than discuss the possibility of obtaining persuasive, scientific evidence, Trial Counsel advised Petitioner to express his remorse and throw himself at the trial court's mercy. *See id.* Although Trial Counsel states in his affidavit that he and Petitioner discussed the possibility of hiring an expert, Trial Counsel fails to state that he specifically

12

discussed the importance of hiring a forensic psychologist for mitigation purposes.
SHCR 120. Moreover, Trial Counsel's affidavit demonstrates that he incorrectly
believed that Petitioner's therapist, Sarah Trevino, qualified as an expert despite her
having no expertise in forensic psychology and, thus, being a lay witness who was
limited to testifying about her observations of Petitioner at the therapy sessions. *See*
TEX. R. EVID. 701; *see also* SHCR 120. By Trevino's own admission, she was not
aware of any facts about Petitioner or the case beyond what they discussed in their
therapy sessions. 3 RR 58.

For the state habeas corpus writ application, Petitioner retained Marisa Mauro,
an experienced forensic psychologist. Her forensic report and CV were part of the
record/evidence in the state court proceedings. *See* SHCR 74-87 (forensic report);
*see also* SHCR 89-98 (Dr. Mauro's CV).

Here, Trial Counsel had a reason to retain an expert in forensic psychology to
evaluate Petitioner and educate the trial court regarding his rehabilitative prospects,
yet he failed to fulfill his duty to do so. This failure to conduct a diligent investigation
constitutes a deficient performance, especially in light of the fact that Trial Counsel's
only mitigating evidence at the punishment hearing came from the testimony of a
novice counselor (Trevino) who did not have any training in either forensic
psychology or risk assessments.

    2. <u>Prejudice</u>

The prejudice prong of an ineffective assistance of counsel claim is analyzed under the "totality of the representation" standard. *See Strickland*, 466 U.S. at 690.

Here, forensic psychologist Dr. Marisa Mauro reviewed the facts of the underlying criminal case and interviewed Petitioner. Her report demonstrates that Petitioner would have had a compelling argument regarding his rehabilitative prospects and low probability of recidivism, which would have influenced the trial court's decision on punishment. *See* SHCR 74-87 (forensic report).

First, Dr. Mauro reviewed Petitioner's "Family of Origin, Childhood Behavior, and Childhood Abuse." SHCR 78-79. This section of the report revealed that Petitioner was a victim of childhood bullying at an early age, and then he witnessed his mother being verbally and physically abused by a boyfriend after his parents divorced. SHCR 78. Further, Petitioner reported that his mother abused alcohol and drugs in the home. *Id.* Regarding Petitioner's relationship with his father, it was a tumultuous one, as he recalled regularly spitting on his father during arguments when he was 11- or 12-years-old, leading to his father kicking him out of the house. SHCR 78-79.

Significantly, Petitioner revealed to Dr. Mauro that he was also the victim of childhood abuse (sexual, mental, and physical) at the hands of his best friend, Ethan. SHCR 79. Ethan began showing Petitioner pornography when they were just 7-

years-old. Moreover, Ethan touched and grabbed Petitioner's penis, along with regularly starting physical fights with him. *Id.*

In the next section of the report titled "Education and In-School/Peer Behavior," Dr. Mauro discusses how Petitioner was ostracized by his middle-school peers; he and Ethan then began engaging in criminal mischief (e.g., breaking windows or throwing paint on people's houses). *Id.* Petitioner also was sent to an alternative school in the 8th grade for 30 days for yelling at a teacher who he thought was laughing at him. *Id.* Once Petitioner began high school, he only attended for two weeks because he thought "everyone was looking at me." *Id.* Petitioner felt "embarrassed and depressed" at this point in his life, and he was experiencing social anxiety, which prevented him from speaking in school and caused him nausea. *Id.* After dropping out of school, Petitioner isolated himself at his mother's apartment for year. *Id.* Dr. Mauro further describes how important others' opinions were to Petitioner's sense of self-worth:

> Bradley remembered that the opinions of others were critical to him, and he wanted to be popular at school and with peers. He said he equated being popular with acting out, doing drugs, and drinking. He thought he would be respected if he demonstrated not caring about anything and a willingness to hurt others. Bradley remembered developing this belief system around 10 after another student showed him a video of a man being tortured. At the time, Bradley recalled thinking it was horrible. When he was sent to juvenile, another boy talked with him about a community referred to as "The Gore," which focuses on violent videos. Bradley was released from juvenile and

connected with that community by watching the content. He grew to believe that making violent videos was a good way to get attention.

Bradley said he never got the attention he wanted from other students and felt like an outcast. He recalled that the popular kids played sports, and he tried but quit after one season. He said he was bullied by popular kids and said they would do things to him like "licking a French fry and giving it to [him]." He said they would try to beat him up. Bradley likened his experience at school to a television show, 13 Reasons Why.

SHCR 79-80

In the next section of her report, Dr. Mauro details Petitioner's "Mental Health History." To summarize, Petitioner's history included four psychiatric hospitalizations, beginning at age 11 or 12. *Id*, at 80. Dr. Mauro's report then describes how Petitioner began self-harming at age 12:

Bradley said he started self-harming around 12 because he saw somebody do it at school and wanted to try. He found the behavior "addicting." He said he viewed himself as a horrible person and thought he was helping others by hurting himself. He cut, burned, and hit himself. While this made him feel worthless, Bradley said he felt calmer because it affirmed his concerns. He continued the behavior into prison and said he stopped five months before the interview. He denied that it was ever sexually arousing to inflict harm or pain on himself.

Bradley said that he also has a history of problems with disordered eating and purging that began around the time he started self-harming. When he was in school, Bradley sometimes made himself vomit to stay home. He said he also wanted to be "as thin as possible," explaining that the popular kids were thin, and he just wanted to continue to try to lose weight. Bradley denied that he was ever overweight as a student, however. He said he entered prison around 220 pounds and weighed about 150 at the interview.

SHCR 81-82

16

The subsequent two sections, titled "Other Childhood Behavior Problems" and "Substance Abuse History" further detail Petitioner's troubled upbringing. SHCR 82.

Next, Dr. Mauro's report details Petitioner's recollection of his offense conduct:

> When asked to describe the events leading to his controlling case, Bradley said that it started when he was 10 and saw a video of a man being hit with a hammer and then stabbed 15 times in the face with a screwdriver. The video was "Run the Gauntlet," and his same-aged friend, Hank, told him to watch it. Bradley said it made him sick to his stomach, and he telephoned his father crying. He recalled experiencing an adrenaline-like rush from the shock. After thinking later on about the video, Bradley thought it must not be that bad and rewatched it. His response was less intense, and he started entering related group chats where he encountered people telling others to cut themselves. Bradley said he stopped after going to juvenile and recognized that he felt traumatized by the videos and chats. Bradley reengaged with the violent video community after releasing from juvenile and talking to "Trippy" from The Gore on Snapchat. He thinks that Trippy is near his age. They started communicating regularly, and Trippy invited Bradley to a server. Bradley said he did not intend to revisit violent videos but did. He thought they were not that bad and would not impact him. He got the idea to become more involved in that community and started his group chat, "764," which he explained were the first numbers in his zip code.

> Initial rules for 764 included no animal or child abuse; Bradley explained that it is not unusual for people in these communities to post videos of animal torture, child abuse, and abortion. At first, 764 abided by this rule, and posted torture content was restricted to adults. This changed after Bradley began interacting with "The Greggy Cult group...a cult-like following of this dude. They made a group chat about him and made it look like he's our God. He's just a guy they extorted.

They made him get on camera and made him hurt himself by getting his personal information and blackmailing him." Bradley said he started "extorting" members of the Greggy Cult, and around the same time, he started "promoting" child pornography.

Bradley explained that a program called "OBS Studio" allows the user to broadcast a video using a computer camera to another person's screen during video chats. He used this during video chats to expose people in attendance to child pornography. At the time, Bradley said he thought witnessing the members' anger and disgust was funny. Later, Bradley said he decided to put the child pornography videos in open chats, and he branched out to "invade" outside groups such as celebrity chats. Bradley commented that he targeted a celebrity group, thinking his behavior might make the news, but it did not.

Still seeking more attention, Bradley next emulated the Greggy Cult, which received media attention for blackmailing people to self-harm. He remarked that he decided to "take it to a whole different level...a lot worse." Bradley remembered that he had a girl on a call near his age and asked members to suggest what he should make her do. He was told to have her cut herself; another said to make her kill a pet. Bradley thought this would get more attention for 764, so he and the group told her to kill her cat. She did not, but she killed her hamster, cut it into pieces, and ate it. Bradley said he was able to get the girl to engage in the behavior with blackmail; she had sent nude content to a male, who sent it to Bradley. Bradley estimated that he manipulated three or four people into doing things using his group. Regarding sharing child pornography and child torture/abuse, Bradley said he obtained the content from other group chats.

SHCR 82-83

Dr. Mauro's report then summarizes Petitioner's underlying explanations for his behavior and activities, which obsessively occupied his time after dropping out of high school:

Overall, Bradley said his group was "like a cult...because they were worshiping me. It was weird. People would get on the video call and just start cutting themselves. Really just teens and young adults wanting attention. They would come in and act a fool, and people would praise that." He said that, on average, he would have 200 people in his group on Discord. He also had a group chat on Telegram, but the illegal activities occurred on Discord. Bradley explained that these activities occupied his time after dropping out of school. He said he was "obsessed with all the attention I was getting." Bradley remembered that he finally felt good about himself and, eventually, superior to others because people in The Gore talked about him and knew who he was.

SHCR 83

Next, Dr. Mauro detailed Petitioner's current psychological status, which encompassed normal observations. SHCR 84. Following her DSM-5 Diagnostic Impression, Dr. Mauro made "Conclusions and Recommendations" regarding the case, which are analogous to the expert opinion she would have provided if called to testify at the punishment hearing:

> Bradley's case is remarkable for information that might have been considered mitigating for purposes of assessing his punishment but was not provided or inadequately addressed at his sentencing hearing, namely his young age, mental health, absence of early intervention, substance use, family implications, and early introduction to sex. Further, a risk assessment and prognosis for treatment would have aided the judge in assessing Bradley's risk of committing a future offense, his potential for violence to the community, and his likelihood of rehabilitation, but were not conducted.

> ### Age

> Firstly, Bradley was just 15 years old at the time of the offense. While it is true that young offenders tend to recidivate more often than older offenders, individuals such as Bradley who have offended at a young

19

age usually do *not* go on to offend as adults. This is because careless, impulsive, defiant, oppositional, and asocial behavior during youth often does not persist into adulthood. Children, teens, and young adults are likelier than older adults to engage in immature and impulsive acts. These actions may or may not become a regular part of their character as they age. Indeed, there is no indication that Bradley has been charged with or convicted of illegal acts as an adult. The sentencing hearing testimony provides that he was not accused of another unlawful act after age 15 and that he complied with bond conditions.

Psychological research has demonstrated that teenagers' psychosocial maturity is slower to develop than their cognitive capacity. One study sponsored by the MacArthur Foundation Research Network on Adolescent Development and Juvenile Justice found that while the adolescent sample studied nearly reached their peak cognitive maturity at 16 to 17 years old, the same group did not reach their peak psychosocial maturity as measured by risk perception, sensation seeking, impulsivity, resistance to peer influence, and future orientation until their mid to late twenties.[1] This psychosocial immaturity in children and teens may contribute to poor decision-making and behavior that is grounds for arrest. Another study of 1,355 juvenile offenders aged 14 to 17 convicted of felonies or serious misdemeanors found that less than 10% continued to commit crimes into adulthood.[2] The American Bar Association and the United States Supreme Court have also recognized the mitigating impact of age due to psychosocial immaturity factors.[3]

In Bradley's case, the judge assessing punishment stated, "Starting at 15, and presenting that as a form of mitigation, carries no weight with this court. A five-year-old or seven-year-old child already has the basic sense of morale decency that you, sir, do not have. There is something horribly wrong with you. Horribly."

### *Mental Health*

Anger, a secondary emotion, seemed to color Bradley's youth. It is most likely that depression and related feelings of isolation, rejection, and worthlessness surfaced in Bradley as anger, aggression, violence, and acting out. He did not have the necessary coping tools needed to deal with his problems, bullying, and emotions. Bradley's depression

and social rejection appear to be the underlying cause of his actions leading to his controlling case.

Bradley first experienced being admired and popular in his Internet group, something he long sought. While the sentencing hearing testimony from Bradley's community supervision officer, Mr. Stidham, provided that Bradley's primary motivation for possessing child pornography was to attract and maintain group members, Bradley's only defense witness, his therapist, Ms. Trevino, was not made aware of Bradley's specific acts leading to his criminal case before the hearing. Ms. Trevino, therefore, did not have the opportunity to assess his motivations for committing the acts nor any contributing implications from Bradley's past experiences or mental health. No psychologist or psychiatrist testified at Bradley's sentencing hearing. No opinions were offered regarding his capacity to benefit from treatments aimed at reducing his depression, anxiety, and aggressive tendencies.

### *Absent and Failed Early Intervention*

Related to the mental health implications in Bradley's case, the absence of appropriate early intervention could have been offered for migration at sentencing. Available information suggests that confinement as a juvenile was the primary tool used to address Bradley's behavioral problems. Bradley might have benefited from early childhood interventions aimed at improving his social skills, reducing depression and anxiety, coping with his parents' divorce, and developing anger management strategies. Such services were readily available through early intervention programs, school systems, community mental health centers, diversion programs, and private providers. There was no testimony in Bradley's sentencing hearing about system-wide failures to identify his early intervention needs.

### *Early Sexualization*

Bradley reported to this examiner that he feels a same-aged friend sexually abused him during childhood. He explained that his friend introduced him to pornography and touched his genitals. Bradley told this examiner that he did not realize the behaviors were abusive until recently. Delayed disclosures of childhood abuse or sexual experiences are not unusual. Untreated, Bradley's distressing memories and

21

unresolved anger toward his friend could have contributed to his childhood asocial behaviors leading up to his offense. No testimony was offered about the impact on Bradley regarding his report of being sexually abused.

### Substance Use

Bradley reported early substance use, including using with his older sister. Substance use may contribute to lowered inhibitions and poor decision-making. Bradley's actions, in his case, reflect poor behavioral control and appraisal of consequences to himself and others. Substance abuse problems can be treated and monitored. No expert opinions were offered at sentencing about the role of substance use in Bradley's offending or his potential to benefit from substance use rehabilitation.

### Family and Caregiver Implications

At the time of the offense, Bradley was just 15 years old. His parents divorced when he was in elementary school, and he reported feeling unsupported and unloved by them and other caregivers. He stated that his mother and older sister suffered from alcohol use problems, and his sister condoned and even supported his drinking at a young age. His mother was involved with abusive and criminally oriented men during his formative years. Bradley felt his father preferred his sisters and held low opinions of Bradley. His family members' problems and inadequate coping skills to address parenting challenges Bradley seemed to contribute to his frequent boundary testing via acting out at home, school, and in the community. Bradley was removed from his parent's care due to their inability to appropriately supervise him and placed in detention, where he was immersed with asocial youth and first introduced to shock videos depicting violence. There was no testimony from a mental health professional about the impact of Bradley's upbringing on his behavior leading to the offense or his capacity to recover from perceived early traumas.

SHCR 84-86

Dr. Mauro concludes her report by describing how Trial Counsel's failure to

obtain a formal risk assessment handicapped Petitioner at the punishment hearing:

### *Risk Assessment*

Bradley did not have a formal risk assessment completed at the time of his sentencing hearing. In addition to concerns about general harm to others, it is possible that concerns about future risk for violence and sexual offending could have contributed to the sentence he received. I believe that was a formal risk assessment conducted, Bradley's defense team could have offered testimony suggesting that his future risk for violence and sexual recidivism was low.

Testimony presented at Bradley's sentencing hearing was absent any professional risk assessment. No actuarial or structured professional judgment tools were used to support the opinions offered about his risk to the community or reported "depravity." I reviewed the PSI report, and it contained no structured risk assessment. There are well-known tools available to offer risk assessment for general criminal recidivism, such as the Level of Service Inventory-Revised (LSI-R), and violence risk assessment, such as the Historical Clinical Risk Management-20 Version 3 (HCR-20 V3).

While the most widely used actuarial tools for predicting sexual recidivism, the Static 99-R and the Static 2002R, are not normed on individuals like Bradley who do not have arrests or convictions as an adult for sexual offending or have been accused or convicted of a child pornography crime only, there is related research available. For example, in a 2013 meta-analysis by Seto and colleagues using a sample of mostly child pornography offenders (total sample size 2, 630 online offenders), followed for approximately 3.4 years, the total recidivism rates were low compared to typical samples of sexual offenders: Approximately 5% of the child pornography offenders were arrested for a new sexual offense of any kind, 3.4% for a new child pornography case, and 2.1% for a new contact sexual offense. Seto reported that several online offender studies reviewed had no sexual recidivists. The study concluded that most online-only sex offenders are low-risk.

SHCR 87

Without Dr. Mauro's forensic evaluation and expert opinion, the trial court was left with a misperception that Petitioner was unredeemable due to the depravity of the images seized in this case. 3 RR 64-65. The trial court then explained that Trial Counsel's evidence of mitigation was completely unpersuasive:

> Starting at 15, and presenting that as a form of mitigation, carries no weight with this court.
>
> A five-year-old or seven-year-old child already has the basic sense of morale decency [sic] that you, sir, do not have. There is something horribly wrong with you. Horribly.
>
> You possessed and promoted this material, not only for some perverse form of self-gratification, but even more disturbing, for the manipulation and control of others.
>
> There is evidence of excessive pride, greed, wrath, envy, lust, glutony [sic], and sloth, in this case.
>
> 3 RR 65

Dr. Mauro's expert opinion would have provided convincing evidence of mitigation that was not presented at the sentencing hearing due to Trial Counsel's deficient performance. By putting Petitioner's crime into the perspective of a lonely, abused teenager attempting to get attention, Dr. Mauro would have been able to explain the offense conduct in a more sympathetic manner; she then would have used an evidence-based risk assessment to show that Petitioner would be able to be a functioning member of society through therapy and medication. This expert testimony had a reasonable probability of persuading an open-minded judge that a

24

probation sentence (or at least a reduced prison sentence followed by probation) would have been appropriate given all of the scientific factors. As a result, there is a reasonable probability of a different result if Trial Counsel had obtained the services of an expert forensic psychologic to conduct a forensic evaluation and formal risk assessment.

    B. <u>The state court adjudication was based on an unreasonable determination of the facts in light of the evidence presented.</u>

The trial court failed to make findings of fact when it denied Petitioner's state writ application on December 9, 2024, which was just three days after the State filed its Answer/Reply. *See* SHCR 136. The trial court simply wrote in its order: "after considering the application of [Petitioner] and the response of the Special Prosecutor filed on December 6, 2024," it determined that the writ application "is without legal or factual merit and should be denied without hearing." *Id*. Thus, the State's rendition of the facts in its Answer/Reply was implicitly adopted by the trial court in denying the state writ application. The state court's denial of the writ hinged on an unreasonable determination that Sarah Trevino (Petitioner's therapist) was an expert witness at the sentencing hearing, when she was actually a mere fact witness.

In the State's Answer/Reply, the State argued that Petitioner's claim should be denied because he retained an expert, Sarah Trevino, to testify about her impressions from her therapy sessions with Petitioner. SHCR 101. According to the

25

State's argument, which was adopted by the trial court, because Trevino was an expert psychologist, Petitioner's claim that his trial counsel failed to present expert testimony is without merit. SHCR 101.

The State's argument, which lacked any citation to legal authority, misconstrued Trevino's role at the sentencing hearing. Trevino testified as a fact witness, not an expert witness. Her testimony detailed her observations from her therapy sessions with Petitioner, but she was never qualified as an expert witness. In fact, Trevino testified that she was licensed as an LPCA (licensed professional counselor associate) at the time of the hearing, meaning that she worked under the supervision of another individual, and she had held this license for only 22 months at the time of the hearing. 3 RR 50-51. Moreover, contrary to the State's claim that Trevino is a psychologist, her licensure demonstrates that she is a counselor, not a psychologist.

If Trial Counsel had retained an expert in forensic psychology, he would have discovered the root causes of Petitioner's mental-health issues, which led to the conduct that the trial court found to so abhorrent at sentencing. Moreover, a forensic psychologist would have been able to opine about Petitioner's chances of rehabilitation in a manner that a relatively inexperienced counselor like Sarah Trevino was unable to do.

26

Dr. Marisa Mauro, whom Petitioner retained for the purposes of his state writ application, explained that Trevino's fact testimony regarding her therapy sessions was limited in scope compared to the expertise of a qualified forensic psychologist:

> While the sentencing hearing testimony from [Petitioner's] community supervision officer, Mr. Stidham, provided that [Petitioner's] primary motivation for possessing child pornography was to attract and maintain group members, [Petitioner's] only defense witness, his therapist, Ms. Trevino, was not made aware of [Petitioner's] specific acts leading to his criminal case before the hearing. Ms. Trevino, therefore, did not have the opportunity to assess his motivations for committing the acts nor any contributing implications from [Petitioner's] past experiences or mental health. No psychologist or psychiatrist testified at [Petitioner's] sentencing hearing. No opinions were offered regarding his capacity to benefit from treatments aimed at reducing his depression, anxiety, and aggressive tendencies.

SHCR 85-86

Moreover, the trial court never made a determination that Trevino was an expert witness pursuant to TEX. R. EVID. 702. *See Kelly v. State*, S.W.2d 568, 572-73 (Tex. Crim. App. 1992) (holding that the trial court's task in assessing admissibility under Rule 702 "is to determine whether the scientific evidence is sufficiently reliable and relevant to help the jury in reaching accurate results." To be considered reliable, evidence based on a scientific theory must satisfy three criteria: (1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied on the occasion in question.)

27

Here, Trevino was merely a lay witness testifying about her observations from therapy sessions, and at most, she could offer an opinion based on her observations. *See* TEX. R. EVID. 701. By Trevino's own admission, she was not aware of any facts about Petitioner or the case beyond what they discussed in their therapy sessions. *See* 3 RR 58. Meanwhile, Dr. Mauro is an experienced forensic psychologist who conducted a comprehensive review of the case and Petitioner's background in order to offer an expert opinion. Her detailed report demonstrates that Petitioner would have had a compelling argument regarding his high likelihood of rehabilitation and low probability of recidivism, which would have influenced the trial court's decision on punishment. *See* SHCR 74-87.

In sum, the state court made an unreasonable determination that Petitioner already had retained an expert for sentencing, and this unreasonable determination of the facts was the basis for the state court's decision to deny Petitioner's claim that Trial Counsel was ineffective for failing to investigate and retain expert assistance.

C. The state court adjudication constitutes an unreasonable application of clearly-established Supreme Court precedent.

In finding that Petitioner failed to satisfy the two-prong *Strickland* test for ineffective assistance of counsel, the state court unreasonably applied clearly-established Supreme Court precedent, as set forth in *Strickland v. Washington*, 466 U.S. 668 (1984) and *Wiggins v. Smith*, 539 U.S. 510, 527-28 (2003) (holding that

there is no strategic decision with respect to defense counsel's sentencing strategy where counsel chooses to abandon their investigation at an unreasonable juncture). In interpreting this precedent, the Fifth Circuit has held that "[i]n investigating potential mitigating evidence, counsel must either (1) undertake a reasonable investigation or (2) make an informed strategic decision that investigation is unnecessary." *Charles v. Stephens*, 736 F.3d 380, 389 (5th Cir. 2013) (per curiam). "[U]nder a *Strickland* analysis, trial counsel must not ignore pertinent avenues of investigation, or even a single, particularly promising investigation lead." *Id.*, at 390 (internal quotation marks and citations omitted).

Petitioner's trial counsel failed to investigate and retain a forensic psychologist, which was vital expert assistance in his case. While Trial Counsel stated in his affidavit that he believed that Petitioner's counselor (Sarah Trevino) would do an adequate job of understanding whether Petitioner "posed a present danger to society," Trial Counsel failed to explain why he did not retain expert assistance in addition to this fact witness (Trevino) who had no training in forensic psychology. *See* SHCR 120. While Dr. Mauro could opine about the causes of Petitioner's criminal behavior based on her education, experience, and her examination of Petitioner's entire life history, Ms. Trevino was not equipped to provide such expert testimony.

Petitioner was entitled to an advocate who would investigate the law and facts relating to his case. *Bouchillon v. Collins*, 907 F. 2d 589, 597 (5th Cir. 1990). The record reflects, however, that the required investigation never occurred. Trial Counsel failed to conduct a reasonable investigation regarding the need for expert assistance, which constitutes deficient performance. Furthermore, because Trial Counsel failed to investigate the law and facts, his actions cannot be attributed to a reasonable trial strategy. *See id.* ("Tactical decisions must be made in the context of a reasonable amount of investigation, not in a vacuum.").

Because fair-minded jurists could not disagree that the state court unreasonably applied clearly established federal law, as determined by the Supreme Court, this Court should grant relief in the form of a new sentencing trial. *See Harrington v. Richter*, 131 S. Ct. 770, 786 (2011).

PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Petitioner prays that this Court grant his Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. §2254, reverse the judgment of conviction, and remand the case to the trial court for a new sentencing hearing.

Respectfully submitted,

<u>/s/ Christopher M. Perri</u>
CHRISTOPHER M. PERRI
Chris Perri Law
1304 Nueces St.
Austin, Texas 78701
(512) 269-0260
Fax: (512) 675-6186
chris@chrisperrilaw.com
State Bar No. 24047769

31